**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| **STARNET INSURANCE COMPANY and** | ) | |
| **BERKLEY NATIONAL INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-597** |
| | ) | |
| **NOTRE DAME FEDERAL CREDIT UNION** | ) | |
| **and DAVID DILLEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs StarNet Insurance Company and Berkley National Insurance Company, for their Complaint for Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 and 2202 against Defendants Notre Dame Federal Credit Union and David Dilley, state as follows:

### NATURE OF ACTION

1.     This is an insurance coverage dispute relating to multiple insurance policies that StarNet Insurance Company ("StarNet") and Berkley National Insurance Company ("BNIC") issued to Notre Dame Federal Credit Union ("NDFCU") that were in effect from 2013 to 2017 (the "Policies").

2.     On September 10, 2021, NDFCU filed a collections action against David Dilley ("Dilley") relating to three consumer loan agreements NDFCU entered into with Dilley, captioned *Notre Dame Federal Credit Union v. David Dilley*, Kosciusko County, Indiana, case no. 43D04-2109-CC-000568 (the "Underlying Lawsuit").

3.      On October 19, 2021, Dilley filed a counterclaim against NDFCU in the Underlying Lawsuit alleging that NDFCU's conduct, before and after the sale of the collateral securing the consumer loan agreements, violated sections of the Indiana Uniform Commercial Code (the "Underlying Matter").

4.      On September 19, 2022, and again on March 23, 2023, Dilley amended the Underlying Matter to assert class action claims against NDFCU on behalf of a purported class of individuals with claims similar to Dilley (the "Putative Class").

5.      On March 15, 2024, NDFCU first provided notice of the Underlying Matter to StarNet and BNIC and demanded coverage under the Policies.  NDFCU's notice was nearly 25 months after Dilley filed his original counterclaim, 18 months after Dilley filed his first amended counterclaim, and 12 months after Dilley filed his second amended counterclaim.

6.      After receiving notice of the Underlying Matter, StarNet and BNIC agreed to investigate the allegations asserted against NDFCU subject to a full and complete reservation of rights.

7.      On July 8, 2024, less than four months after NDFCU provided StarNet and BNIC notice of the Underlying Matter, NDFCU entered into a settlement agreement with Dilley relating to the claims asserted in the Underlying Matter without the consent or approval of StarNet or BNIC (the "Settlement").

8.      StarNet and BNIC seek a judicial declaration that they owe no duty to defend or indemnify NDFCU in connection with the Underlying Matter and Settlement because: (a) the Underlying Matter and Settlement do not trigger the insuring agreement of any of the Policies; (b) various exclusions in the Policies preclude coverage; and (c) NDFCU's breach of its notice, cooperation, and consent obligations precludes coverage.

## THE PARTIES

9.      StarNet is a corporation organized under the laws of Iowa with its principal place of business in Iowa.  StarNet is thus a citizen of Iowa.

10.     BNIC is a corporation organized under the laws of Iowa with its principal place of business in Iowa.  BNIC is thus a citizen of Iowa.

11.     NDFCU is a federally chartered financial cooperative with its principal place of business in Indiana.  NDFCU's activities are localized to Indiana in that its principal place of business is in Indiana, 8 of its 10 branches are in Indiana, and its business activities are centered in Indiana.  NDFCU is thus a citizen of Indiana.

12.     Dilley is domiciled in Indiana and is thus a citizen of Indiana.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a), 2201, and 2202, as complete diversity exists between the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and Plaintiffs seek declaratory relief with respect to a case of actual controversy within this Court's jurisdiction.

14.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1), because NDFCU and Dilley reside in this district and all defendants are residents of Indiana.

15.     Venue is also appropriate in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Underlying Matter occurred in this district.

## BACKGROUND

### The Underlying Lawsuit

16.    On September 10, 2021, NDFCU filed a Complaint against Dilley in the Underlying Lawsuit in Superior Court of Kosciusko County, Indiana, which was assigned case number 43D04-2109-CC-000568. A true and correct copy of the Complaint in the Underlying Lawsuit is attached hereto as **Exhibit A**.

17.    The Underlying Lawsuit alleges that NDFCU entered into four agreements with Dilley, pursuant to which NDFCU extended credit to Dilley in exchange for Dilley's agreement to make periodic payments until the contract balance was satisfied (the "Dilley Contracts").

18.    The Underlying Lawsuit further alleges that Dilley failed to make the required payments under the Dilley Contracts, and that NDFCU subsequently repossessed and sold the subject collateral. The Underlying Lawsuit seeks approximately $26,000.00 (plus interest, attorneys' fees, and costs) from Dilley, which NDFCU alleges is the amount remaining under the Dilley Contracts following the sale of the collateral.

### The Underlying Matter

19.    On October 19, 2021, Dilley filed a Counterclaim against NDFCU in the Underlying Lawsuit (the "Counterclaim"). A true and correct copy of the Counterclaim is attached hereto as **Exhibit B**.

20.    The Counterclaim alleges that the Dilley Contracts are consumer loan agreements for the purchase of a 2015 Jeep Grand Cherokee, a 2016 KZI Camper, and a 2012 Polaris Sportsman (the "Collateral"), which Dilley entered into with NDFCU in February and March of 2018.

21.    The Counterclaim admits that NDFCU obtained a security interest in the Collateral.

22.    The Counterclaim alleges that NDFCU failed to sell the Collateral in a commercially reasonable manner.

23.    The Counterclaim alleges that NDFCU violated IC § 26-1-9.1-601 through § 26-1-9.1-628 of the UCC in repossessing and selling the Collateral.

24.    Counts I through III of the Counterclaim allege that NDFCU violated IC § 26-1-9.1-601 through § 26-1-9.1-628 of the UCC through its sale of the Collateral.

25.    Count I through III of the Counterclaim seek the following relief from NDFCU: (a) statutory damages pursuant to IC § 26-1-9.1-625 (c)(2) of the UCC; (b) statutory damages pursuant to IC § 26-1-9.1-625(e) of the UCC; (c) interest; (d) a declaration that Dilley owes nothing to NDFCU on the Dilley Contracts; (e) an order requiring NDFCU to remove adverse credit information that NDFCU previously reported to credit reporting organization; and (f) attorneys' fees.

26.    On September 20, 2022, Dilley filed a First Amended Counterclaim in the Underlying Lawsuit (the "First Amended Counterclaim"). A true and correct copy of the First Amended Counterclaim is attached as **Exhibit C**.

27.    The First Amended Counterclaim states that it is a consumer class action against NDFCU for NDFCU's unlawful repossession practices and procedures.

28.    The First Amended Counterclaim alleges that IC § 26-1-9.1-611(b) of the UCC requires a secured creditor, before disposition of a consumer's repossessed collateral, to send the consumer-debtor a "reasonable authenticated officiation of disposition," which provides the consumer-debtor with specific information about the intended disposition and the consumer-debtor's redemption rights.

29.    The First Amended Counterclaim alleges that IC §§ 26-1-9.1-613 and 26-1-9.1-614 of the UCC set forth the mandatory information that the secured party must include in the written notice of intended sale of the collateral (hereinafter the "presale notice").

30.    The First Amended Counterclaim alleges that IC § 26-1-9.1-616 of the UCC requires that the secured party mail consumer-debtors an "explanation" of surplus or deficiency after it sells the debtors' vehicles (a "post-sale notice").

31.    The First Amended Counterclaim alleges that IC § 26-1-9.1-616 of the UCC also requires that the post-sale notice include specific information and the order in which the information must be presented.

32.    The First Amended Counterclaim contains allegations about the Dilley Contracts and the Collateral that are identical or substantially similar to the allegations set forth in the original Counterclaim.

33.    The First Amended Counterclaim alleges that on March 1, 2021, after NDFCU repossessed the Collateral, NDFCU mailed Dilley three documents informing him that the Collateral would be sold at a private sale (the "Dilley Pre-Sale Notices").

34.    The First Amended Counterclaim alleges that on March 19, 2021, after NDFCU sold the Collateral, NDFCU mailed Dilley three documents titled "Deficiency Balance Notification" (the "Dilley Post-Sale Notices").

35.    The First Amended Counterclaim seeks to certify a class of all consumers who NDFCU mailed a pre-sale notice and whose collateral was sold by NDFCU, NDFCU's agent, or an assignee on or after February 11, 2012 (the "Putative Class").

36.    The First Amended Counterclaim alleges that at least one of the issues identified in the Dilley Pre-Sale Notices are present in the pre-sale notices mailed to the Putative Class.

37.    The First Amended Counterclaim alleges that the post-sale notices issued by NDFCU to the Putative Class did not substantially comply with the UCC.

38.    Count I of the First Amended Counterclaim alleges that the Dilley Pre-Sale Notices and the pre-sale notices mailed by NDFCU to the Putative Class failed to comply with the UCC.

39.    Count II of the First Amended Counterclaim alleges that the Dilley Post-Sale Notices and the post-sale notices mailed by NDFCU to the Putative Class failed to comply with the UCC.

40.    Counts I and II of the First Amended Counterclaim seek the following relief from NDFCU: (a) actual damages equal to the statutory damages provided by IC § 26-1-9.1-625 (c)(2) of the UCC; (b) statutory damages pursuant to IC § 26-1-9.1-625(e) of the UCC; (c) interest; (d) a mandatory injunction compelling NDFCU to remove any adverse credit information wrongfully reported on Dilley's and the Putative Class's consumer credit reports; (e) a declaration that the pre-sale notices mailed by NDFCU to Dilley and the Putative Class fail to comport with the statutory requirements; and (f) attorneys' fees.

41.    The First Amended Counterclaim alleges that NDFCU "has maintained a practice and policy of reporting derogatory information regarding the class members['] defaults and post-sale loan balances to consumer credit reporting agencies like Equifax Credit Information Services, Inc., Experian, Inc., and TransUnion, LLC," which: (a) has harmed the class members' credit worthiness, credit standing, credit capacity, character, and general reputation; (b) slanders or libels the class members; and (c) invaded the class members' privacy rights.   The First Amended Counterclaim, however, contains no claims for relief related to these allegations.

42.    On May 23, 2023, Dilley filed a Second Amended Counterclaim in the Underlying Lawsuit (the "Second Amended Counterclaim"). A true and correct copy of the Second Amended

Counterclaim is attached hereto as **Exhibit D**. The underlying court deemed the Second Amended Counterclaim filed on May 23, 2024.

43.    The Second Amended Counterclaim contains allegations about the Dilley Contracts and the Collateral that are identical or substantially similar to the allegations in the First Amended Counterclaim.

44.    The Second Amended Counterclaim also contains allegations about the Putative Class that are identical or substantially similar to the allegations in the First Amended Counterclaim.

45.    Count I of the Second Amended Counterclaim alleges that the Dilley Pre-Sale Notices and the pre-sale notices mailed by NDFCU to the Putative Class failed to comply with the UCC.

46.    Count II of the Second Amended Counterclaim alleges that the Dilley Post-Sale Notices and the post-sale notices mailed by NDFCU to the Putative Class failed to comply with the UCC.

47.    Counts I and II of the Second Amended Counterclaim seek the following relief from NDFCU: (a) actual damages equal to the statutory damages provided by IC § 26-1-9.1-625 (c)(2) of the UCC; (b) statutory damages pursuant to IC § 26-1-9.1-625(e) of the UCC; (c) interest; (d) a mandatory injunction compelling NDFCU to remove any adverse credit information wrongfully reported on Dilley's and the Putative Class's consumer credit reports; (e) a declaration that the pre-sale notices mailed by NDFCU to Dilley and the Putative Class fail to comport with the statutory requirements; (f) a declaration that the post-sale notices mailed by NDFCU to Dilley and the Putative Class fail to comport with the statutory requirements; and (g) attorneys' fees.

**The StarNet Policies**

48.   StarNet issued the following policies (the "StarNet Policies") to NDFCU:

| POLICY NO. | POLICY PERIOD | LIMIT OF INSURANCE |
|---|---|---|
| FPP 1000093 00 | 4/17/13 to 4/17/14 | $1M Personal and Advertising Injury / $2M Aggregate |
| FPP 6017010-10 | 4/17/14 to 4/17/15 | $1M Personal and Advertising Injury / $2M Aggregate |
| FPP 6017010-11 | 4/17/15 to 4/17/16 | $1M Personal and Advertising Injury / $2M Aggregate |
| FPP 6017010-12 | 4/17/16 to 4/17/17 | $1M Personal and Advertising Injury / $2M Aggregate |

True and correct copies of the StarNet Policies are attached hereto in chronological order as **Exhibits E**, **F**, **G**, and **H,** respectively).

49.   The Insuring Agreement for Coverage A (Bodily Injury and Property Damage Liability) of the StarNet Policies' Commercial General Liability Coverage Form provides, in relevant part, the following with respect to the scope of coverage afforded therein:

**1.    Insuring Agreement**

   **a.**   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. [. . .]

*   *   *

   **b.**   This insurance applies to "bodily injury" and "property damage" only if:

   **(1)**   The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
   **(2)**   The "bodily injury" or "property damage" occurs during the policy period; [. . .]

*   *   *

50.    The StarNet Policies define the terms "bodily injury," "property damage," and "occurrence" as follows:

**3.**    "Bodily injury" means bodily injury, sickness or disease sustained by a person, including mental anguish, mental injury, humiliation, shock, fright or death resulting from any of these at any time.

* * *

**15.**    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

* * *

**20.**    "Property damage" means:

a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it. [. . .]

* * *

51.    The coverage afforded by Coverage A of the StarNet Policies' Commercial General Liability Coverage Form is also subject to various exclusions.

52.    An exclusion titled "Expected Or Intended Injury" precludes coverage for the following:

**a.    Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

53.    An exclusion titled "Damage To Property" precludes coverage for the following:

**j.    Damage To Property**

"Property damage" to:

**(1)**    Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

\* \* \*

    **(4)**      Personal property in the care, custody or control of the insured.

\* \* \*

54.    An endorsement to the StarNet Policies titled "Recording and Distribution of Material or Information in Violation of Law Exclusion" (the "Violation of Law Exclusion"), states that the policies do not apply to:

    **q.**    **Recording And Distribution Of Material Or Information In Violation Of Law**

    "Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

\* \* \*

    **(3)**      The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

    **(4)**      Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA, and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

55.    Exclusion u. (Professional Services) of the StarNet Policies states that the StarNet Policies do not apply to the following:

    **u.**    **Professional Services**

    "Bodily injury" or "property damage" due to the rendering of or failure to render any "professional service".

56.    The StarNet Policies define the term "professional services" and the related term "lending activities" to mean the following:

    **12.**    "Lending activities" means the extension of credit, the actual or alleged failure or refusal to extend credit, or the actual or alleged agreement to extend credit.

\* \* \*

    **19.**    "Professional Services" means those services rendered or required to be rendered to others pursuant to an agreement and for a fee or other payment

and includes non-compensable services, provided they are rendered or required to be rendered in connection with paid services. They include "investment banking activities", "lending activities", financial counseling, insurance operations, real estate operations, and appraisal services.

57.    The Insuring Agreement for Coverage B (Personal and Advertising Injury Liability) of the StarNet Policies' Commercial General Liability Coverage Form provides, in relevant part, the following with respect to the scope of coverage afforded therein:

**1.    Insuring Agreement**

    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will not [sic] have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. [. . .]

                \* \* \*

    **b.**    This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

                \* \* \*

58.    The StarNet Policies afford coverage for sums NDFCU becomes legally obligated to pay as damages because of "personal and advertising injury" to which the StarNet Policies apply, and a duty to defend lawsuits seeking such damages.

59.    The StarNet Policies define the term "personal and advertising injury" to mean, in relevant part, the following:

**16.**    "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

                \* \* \*

    **d.**    Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages [. . .] a person's or organization's goods, products or services;

    **e.**    Oral or written publication, in any manner, of material that violates a person's right of privacy;

* * *

60.     The StarNet Policies only afford coverage for damages because of "personal and advertising injury" offenses committed while each policy is in effect.

61.     The coverage afforded by Coverage B of the StarNet Policies' Commercial General Liability Coverage Form is also subject to various exclusions.

62.     An endorsement to the StarNet Policies titled "Recording and Distribution of Material or Information in Violation of Law Exclusion" (the "Violation of Law Exclusion"), states that the policies do not apply to:

> **p.      Recording And Distribution Of Material Or Information In Violation Of Law**
>
> "Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:
>
> * * *
>
> **(3)**     The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or
>
> **(4)**     Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA, and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

63.     Exclusion r. (Professional Services) of certain StarNet Policies states that the policies do not apply to the following:

> **r.      Professional Services**
>
> "Personal and advertising injury" arising out of the rendering of or failure to render any "professional service".

64.     Pursuant to an endorsement titled "Exclusion – Insurance And Related Operations" (the "Insurance and Related Operations Exclusion"), the StarNet Policies in effect from April 17,

2014 to April 17, 2017 do not apply to "personal and advertising injury" for which NDFCU may be held liable:

> **3.**    Resulting from the rendering of, or failure to render, the following professional services:
>
> * * *
>
> **e.**    Conducting an investment, loan or real estate department or operations.

65.    The StarNet Policies contain conditions precedent that NDCFU must satisfy to obtain coverage.

66.    Coverage under the StarNet Policies is subject to the following notice, cooperation, and voluntary payment conditions:

> **2.    Duties In The Event Of Occurrence, Offense, Claim Or Suit**
>
> **a.**    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include
>
> > **(1)**    How, when and where the "occurrence" or offense took place;
> > **(2)**    The names and addresses of any injured persons and witnesses; and
> > **(3)**    The nature and location of any injury or damage arising out of the "occurrence"
>
> **b.**    If a claim is made or "suit" is brought against any insured, you must:
>
> > **(1)**    Immediately record the specifics of the claim or "suit" and the date received; and
> > **(2)**    Notify us as soon as practicable.
>
> > You must see to it that we receive written notice of the claim or "suit" as soon as practicable.
>
> **c.**    You and any other involved insured must:
>
> > **(1)**    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit",
> > **(2)**    Authorize us to obtain records and other information;

       **(3)**     Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

       **(4)**     Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

    **d.**    No Insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**The BNIC Policies**

67.    BNIC issued the following umbrella insurance policies to NDFCU (the "BNIC Policies"):

| POLICY NO. | POLICY PERIOD | LIMIT | SIR |
|---|---|---|---|
| FUM 6010652-10 | 4/17/13 to 4/17/14 | $5M P&A Injury / $5M Agg. | $10,000 |
| FUM 6010652-11 | 4/17/14 to 4/17/15 | $5M P&A Injury / $5M Agg. | None |
| FUM 6010652-12 | 4/17/15 to 4/17/16 | $5M P&A Injury / $5M Agg. | $10,000 |
| FUM 6010652-13 | 4/17/16 to 4/17/17 | $5M P&A Injury / $5M Agg. | None |

True and correct copies of the BNIC Policies are attached hereto in chronological order as **Exhibits I**, **J**, **K**, and **L**, respectively).

68.    The Insuring Agreement for Coverage A (Bodily Injury and Property Damage Liability) of the BNIC Policies' Commercial Liability Umbrella Form provides, in relevant part, the following with respect to the scope of coverage afforded therein:

    **1.**    **Insuring Agreement**

       **a.**    We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of the "underlying insurance" have been exhausted. When we have no duty

to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. At our discretion, we may investigate any "occurrence" that may involve this insurance and settle any resultant claim or "suit", for which we have the duty to defend. [. . .]

\* \* \*

**b.**    This insurance applies to "bodily injury" and "property damage" only if:

**(1)**    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)**    The "bodily injury" or "property damage" occurs during the policy period; [. . .]

\* \* \*

69.    The BNIC Policies define the terms "bodily injury," "property damage," and "occurrence" in the same way as those terms are defined in the StarNet Policies.

70.    The BNIC Policies define the terms "ultimate net loss," "retained limit," and "underlying insurance," and the related terms "self-insured retention" and "underlying insurer," as follows:

**19.**    "Retained limit" means the available limit of "underlying insurance" scheduled in the Declarations or the "self-insured retention", whichever applies.

**20.**    "Self-insured retention" means the dollar amount listed in the Declarations that will be paid by the insured before this insurance becomes applicable only with respect to "occurrences" or offenses not covered by the "underlying insurance". The "self-insured retention" does not apply to "occurrences" or offenses which would have been covered by "underlying insurance" but for the exhaustion of applicable limits.

\* \* \*

**23.**    "Ultimate net loss" means the total sum, after reduction for recoveries or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of settlement or judgments or any arbitration or other alternate dispute method entered into with our consent or the "underlying insurer's" consent.

**24.**    "Underlying insurance" means any policies of insurance listed in the Declarations under the Schedule of "underlying insurance".

**25.**    "Underlying insurer" means any insurer who provides any policy of insurance listed in the Schedule of "underlying insurance".

71.    The coverage afforded by Coverage A of the BNIC Policies' Commercial Liability Umbrella Form is also subject to various exclusions.

72.    The BNIC Policies contain an exclusion titled "Expected Or Intended Injury" that is identical to the exclusion in the StarNet Policies with the same title.

73.    The BNIC Policies contain an exclusion titled "Damage TO Property" that is identical to the exclusion in the StarNet Policies with the same title.

74.    The BNIC Policies contain the same Violation of Law Exclusion applicable to Coverage A as the StarNet Policies, set forth in an endorsement to the BNIC Policies titled "Recording and Distribution of Material or Information in Violation of Law Exclusion."

75.    Exclusion s. (Professional Services) of the BNIC Policies states that the policies do not apply to the following:

**s.    Professional Services**

"Bodily injury" or "property damage" due to the rendering of or failure to render any professional service. This includes but is not limited to:

**(1)**    Legal, accounting or advertising services;
**(2)**    Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications by any architect, engineer or surveyor performing services on a project on which you serve as construction manager;
**(3)**    Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;
**(4)**    Engineering services, including related supervisory or inspection services;
**(5)**    Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;

**(6)**    Any health or therapeutic service treatment, advice or instruction;

**(7)**    Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement, or personal grooming or therapy;

**(8)**    Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardio-vascular fitness, body building or physical training programs;

**(9)**    Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**(10)**    Body piercing services;

**(11)**    Services in the practice of pharmacy; but this exclusion does not apply if you are a retail druggist or your operations are those of a retail drugstore;

**(12)**    Law enforcement or firefighting services; and

**(13)**    Handling, embalming, disposal, burial, cremation or disinterment of dead bodies.

76.    The Insuring Agreement for Coverage B (Personal and Advertising Injury Liability) of the BNIC Policies' Commercial Liability Umbrella Form provides, in relevant part, the following with respect to the scope of coverage afforded therein:

**1.    Insuring Agreement**

**a.**    We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "personal and advertising injury" when the "underlying insurance" does not provide coverage or the limits of the "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. At our discretion, we may investigate any "occurrence" that may involve this insurance and settle any resultant claim or "suit", for which we have the duty to defend. [ . . .]

* * *

**b.**    This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

* * *

77.     The BNIC Policies define the term "personal and advertising injury" in the same way as that term is defined in the StarNet Policies

78.     The coverage afforded by Coverage B of the BNIC Policies' Commercial Liability Umbrella Form is also subject to various exclusions.

79.     The BNIC Policies contain the same Violation of Law Exclusion applicable to Coverage B as the StarNet Policies, set forth in an endorsement to the BNIC Policies titled "Recording and Distribution of Material or Information in Violation of Law Exclusion."

80.     Exclusion a. (15) of Coverage B of the BNIC Policies states that the BNIC Policies do not apply to "personal and advertising injury":

**(15)  Professional Services**

Arising out of the rendering or failure to render any professional service. This includes but is not limited to:

**(a)**     Legal, accounting or advertising services;

**(b)**     Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications by any architect, engineer or surveyor performing services on a project on which you serve as construction manager;

**(c)**     Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;

**(d)**     Engineering services, including related supervisory or inspection services;

**(e)**     Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;

**(f)**     Any health or therapeutic service treatment, advice or instruction;

**(g)**     Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement, or personal grooming or therapy;

**(h)**     Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardio-vascular fitness, body building or physical training programs;

**(i)**    Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**(j)**    Body piercing services;

**(k)**    Services in the practice of pharmacy; but this exclusion does not apply if you are a retail druggist or your operations are those of a retail drugstore;

**(l)**    Law enforcement or firefighting services; and

**(m)**    Handling, embalming, disposal, burial, cremation or disinterment of dead bodies.

81.    The BNIC Policy in effect from April 17, 2016, to April 17, 2017, contains the same Insurance and Related Operations Exclusion as certain StarNet Policies, set forth in an endorsement titled "Exclusion – Insurance And Related Operations."

82.    Coverage under the BNIC Policies is also subject to the following notice, cooperation, and voluntary payment conditions:

**3.    Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.**    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense, regardless of the amount, which may result in a claim. To the extent possible, notice should include

**(1)**    How, when and where the "occurrence" or offense took place;

**(2)**    The names and addresses of any injured persons and witnesses; and

**(3)**    The nature and location of any injury or damage arising out of the "occurrence"

**b.**    If a claim is made or "suit" is brought against any insured, you must:

**(1)**    Immediately record the specifics of the claim or "suit" and the date received; and

**(2)**    Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.**    You and any other involved insured must:

       **(1)**    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit",

       **(2)**    Authorize us to obtain records and other information;

       **(3)**    Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

       **(4)**    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

    **d.**    No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

83. The BNIC Policies contain the following condition regarding how the policies interact with other insurance:

    **5.**    **Other Insurance**

    **a.**    This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.

        When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

* * *

**<u>NDFCU's litigation of the Underlying Matter before notice to StarNet or BNIC</u>**

84. In 2021, NDFCU served answers to Dilley's First Set of Interrogatories and responses to Dilley's First Set of Requests for Production of Documents.

85. On November 16, 2022, NDFCU filed a motion to compel enforcement of arbitration and class action waiver provision as to Dilley's class action claims. That motion was fully briefed, but NDFCU withdrew its motion on May 8, 2023.

86.    On November 16, 2022, May 18, 2023, and May 23, 2023, NDFCU filed answers to Dilley's Counterclaim, First Amended Counterclaim, and Second Amended Counterclaim, respectively.

87.    On May 5, 2023, Dilley served on NDFCU his First Set of Requests for Admissions, Second Set of Requests for Production of Documents, and Second Set of Interrogatories.

88.    In October 2023, NDFCU and Dilley participated in a full day mediation at which multiple demands and offers were made, ending in Dilley demanding $3,500,000 and ten years of loan deficiency write-offs and NDFCU offering $500,000 and ten years of loan deficiency write-offs.

89.    Upon information and belief, NDFCU did not serve any written discovery on Dilley in connection with the Underlying Matter.

**Notice to StarNet and BNIC**

90.    On March 15, 2024, StarNet and BNIC received their first notice of the Underlying Matter from NDFCU.

91.    In the March 15, 2024, first notice, NDFCU requested that StarNet participate in a mediation scheduled to take place on May 14, 2024.

**StarNet's and BNIC's Investigation**

92.    In a letter dated April 26, 2024, StarNet and BNIC explained to NDFCU that it was investigating NDFCU's tender of coverage subject to a full and complete reservation of rights. A true and correct copy of StarNet's and BNIC's April 26, 2024, letter is attached hereto as **Exhibit M**.

93.     The April 26, 2024, letter requested the following information from NDFCU relevant to NDFCU's tender of coverage and request that StarNet and BNIC participate in mediation:

1. all documents, communications, and other information regarding the identity of the putative class members and when NDFCU reported his/her/their deficiency information to consumer reporting agencies;
2. all documents, communications, and other information regarding the decision to file and withdraw NDFCU's motion to compel arbitration;
3. a summary of all discovery that has taken place to date and which remains to take place prior to trial;
4. all documents, communications, and other information regarding settlement discussion that have taken place to date;
5. all communications between NDFCU and its other insurers regarding the Counterclaim, including copies of all tender letters and insurer responses; and
6. all reports and communications from defense counsel evaluating liability and damages, in addition to all mediation submissions.

94.     The April 26, 2024, letter explained that StarNet and BNIC could not fully evaluate NDFCU's tender of coverage or meaningfully participate in mediation without the requested information.

95.     The April 26, 2024, letter further explained to NDFCU that StarNet's and BNIC's investigation under a reservation of rights should not "be construed as a denial of coverage for the Counterclaim."

96.     NDFCU and Dilley elected to move the mediation from May 14, 2024, to July 8, 2024, to gather more information for StarNet, BNIC, and the other insurance companies to whom NDFCU tendered the Underlying Matter for coverage.

97.     StarNet and BNIC agreed to participate in good faith in the July 8, 2024, mediation, under the stated assumption that StarNet and BNIC would receive all of the information requested in its April 26, 2024, letter within a reasonable amount of time before July 8, 2024.

98.     Throughout May and June 2024, NDFCU provided StarNet and BNIC some, but not all, of the information requested in the April 26, 2024, letter.

99.     On May 31, June 19, June 21, and June 27, 2024, StarNet and BNIC made follow-up requests for the information previously requested from NDFCU, which NDFCU had failed to provide.

100.     As of July 5, 2024, NDFCU had not provided the following information requested by StarNet and BNIC in their April 26, 2024, letter: (1) all documents, communications, and other information regarding the identity of the putative class members and when NDFCU reported his/her/their deficiency information to consumer reporting agencies; and (2) all reports and communications from defense counsel evaluating liability and damages, in addition to all mediation submissions.

101.     In a letter to NDFCU dated July 5, 2024, StarNet and BNIC made a follow-up request for the missing information. A true and correct copy of StarNet's and BNIC's July 5, 2024, letter is attached hereto as **Exhibit N**.

102.     In StarNet's and BNIC's July 5, 2024, letter, StarNet and BNIC reiterated that they were still investigating NDFCU's tender subject to a reservation of rights, and that StarNet had not denied coverage.

103.     In StarNet's and BNIC's July 5, 2024, letter, StarNet and BNIC reminded NDFCU of its obligation to cooperate with them in their investigation of the Underlying Matter, and that NDFCU's voluntary assumption of an obligation to Dilley without StarNet's or BNIC's consent would constitute a material breach of the StarNet and BNIC Policies.

104.     In StarNet's and BNIC's July 5, 2024, letter, StarNet and BNIC explained that they agreed to attend the July 8, 2024, mediation in good faith, but cautioned that their ability to

meaningfully participate in the mediation process would be constrained by NDFCU's own failure to provide the missing material that was requested on numerous occasions.

**The July 8, 2024, Mediation**

105.    StarNet and BNIC attended the July 8, 2024, mediation, as requested by NDFCU.

106.    At that mediation, NDFCU entered into the Settlement with Dilley and the Putative Class, which includes an assignment of NDFCU's rights under the StarNet Policies and BNIC Policies (the "Settlement").

107.    Upon information and belief, the Settlement includes a promise by NDFCU to a judgment against it in an amount to be approved by the court in the Underlying Matter.

108.    Upon information and belief, the Settlement includes an agreement by NDFCU not to present evidence, object to evidence, question witnesses, make arguments, or appeal any decisions or judgments in the Underlying Matter.

109.    NDFCU entered into the Settlement without consulting StarNet or BNIC, and without obtaining StarNet's or BNIC's consent.

110.    NDFCU entered into the Settlement without giving StarNet or BNIC the opportunity to participate in settlement discussions.

111.    StarNet and BNIC were only offered the opportunity to participate in settlement discussions with Dilley and the Putative Class after NDFCU had already assigned its rights in the StarNet Policies and BNIC Policies, and after NDFCU had already made promises about merits and damages in the Underlying Matter as part of the Settlement.

**The Insurance Coverage Dispute**

112.    NDFCU, and Dilley to the extent he asserts he is an assignee of NDFCU, seek insurance coverage from StarNet and BNIC under the Policies for the Underlying Matter and the Settlement.

113.    StarNet and BNIC deny they owe any defense or indemnity coverage for the Underlying Matter and the Settlement under the Policies.

114.    An actual, present, and bona fide controversy exists between StarNet and BNIC, on the one hand, and NDFCU and Dilley, on the other hand, with respect to whether there is insurance coverage for the Underlying Matter and the Settlement under the Policies.

115.    A judicial declaration is necessary to establish the parties' rights and duties, if any, under the Policies for the Underlying Matter and the Settlement.

<strong>COUNT I – NO DUTY TO DEFEND OR INDEMNIFY NDFCU<br>(THE UNDERLYING MATTER DOES NOT IMPLICATE COVERAGE A)</strong>

116.    StarNet and BNIC reallege and restate Paragraphs 1 through 115 above as if fully set forth herein.

117.    Coverage A of the StarNet Policies' Commercial General Liability Coverage Form and the BNIC Policies' Commercial Liability Umbrella Form affords coverage, in relevant part, for damages because of "property damage" during the policy period caused by an "occurrence."

118.    The Underlying Matter does not allege "property damage" as that term is defined in the StarNet Policies and BNIC Policies.

119.    The Underlying Matter does not allege an "occurrence" of "property damage," as those terms are defined by the StarNet Policies and BNIC Policies.

120.    The Underlying Matter does not allege "property damage" that occurred during the effective dates of any StarNet Policy or BNIC Policy.

121.   The Underlying Matter does not seek damages because of "property damage."

122.   The Underlying Matter does not allege an "occurrence" of "property damage" during effective dates of any StarNet Policy or BNIC Policy relating to the Dilley Contracts.

123.   The Underlying Matter does not allege an "occurrence" of "property damage" during effective dates of any StarNet Policy or BNIC Policy relating to loan agreements entered into by the Putative Class, nor do StarNet or BNIC have knowledge of any facts or information confirming that the Underlying Matter involves the sale of the Putative Class's collateral during the effective dates of any StarNet Policy or BNIC Policy.

124.   The Putative Class cannot recover damages from NDFCU for "property damage" that may have occurred during the effective dates of any StarNet Policy or BNIC Policy based on the statute of limitations applicable to recovery of such damages from NDFCU.

125.   The Settlement does not involve the payment of any damages because of an "occurrence" of "property damage," as those terms are defined by the StarNet Policies and BNIC Policies.

126.   Alternatively, any "property damage" caused by an "occurrence" found to be alleged in the Underlying Matter and for which damages are sought in the Underlying Matter or as a part of the Settlement is precluded from coverage by the following exclusions in the StarNet Policies and BNIC Policies:

     a.   The Expected or Intended Injury Exclusion applies;

     b.   The Damage to Property Exclusion applies;

     c.   The Violation of Law Exclusion applies;

     d.   The Professional Services Exclusion applies; and/or

e.   The Insurance and Related Operations Exclusion of the StarNet Policies in effect from April 17, 2014 to April 17, 2017, and of the BNIC Policy in effect from April 17, 2016 to April 17, 2017, applies.

127.   By reason of the foregoing, StarNet and BNIC have no duty to defend or indemnify NDFCU for the Underlying Matter and the Settlement under Coverage A of the StarNet Policies' Commercial General Liability Coverage Form or the BNIC Policies' Commercial Liability Umbrella Form.

## COUNT II – NO DUTY TO DEFEND OR INDEMNIFY NDFCU
## (THE UNDERLYING MATTER DOES NOT IMPLICATE COVERAGE B)

128.   StarNet and BNIC reallege and restate Paragraphs 1 through 127 as if fully set forth herein.

129.   Coverage B of the StarNet Policies' Commercial General Liability Coverage Form and BNIC Policies' Commercial Liability Umbrella Form affords coverage, in relevant part, for damages because of "personal and advertising injury" offenses committed during the policy period.

130.   The Underlying Matter does not allege a "personal and advertising injury" offense during the effective dates of the StarNet Policies or BNIC Policies.

131.   The Underlying Matter does not seek damages because of a "personal and advertising injury" offense.

132.   The Underlying Matter does not allege a "personal and advertising injury" offense committed by NDFCU with respect to the Dilley Contracts during effective dates of any StarNet Policy or BNIC Policy relating to the Dilley Contracts.

133.   The Underlying Matter does not allege a "personal and advertising injury" offense committed by NDFCU during effective dates of any StarNet Policy or BNIC Policy relating to

loan agreements entered into by the Putative Class, nor do StarNet or BNIC have knowledge of any facts or information confirming that the Underlying Matter involves the publication of information by NDFCU to a third-party during the effective dates of any StarNet Policy or BNIC Policy

134.    The Putative Class cannot recover damages from NDFCU for "personal and advertising injury" offenses that may have occurred during the effective dates of any StarNet Policy or BNIC Policy based on the statute of limitations applicable to recovery of such damages.

135.    The Settlement does not involve the payment of any damages "because of" personal and advertising injury.

136.    Alternatively, any "personal and advertising injury" found to be alleged in the Underlying Matter and for which damages are sought in the Underlying Matter, is precluded from coverage by the following exclusions in the StarNet Policies and BNIC Policies:

    a.    The Violation of Law Exclusion applies;

    b.    The Professional Services Exclusion applies; and/or

    c.    The Insurance and Related Operations Exclusion of the StarNet Policies in effect from April 17, 2014 to April 17, 2017, and of the BNIC Policy in effect from April 17, 2016 to April 17, 2017, applies.

137.    By reason of the foregoing, StarNet and BNIC have no duty to defend or indemnify NDFCU for the Underlying Matter and the Settlement under Coverage B of the StarNet Policies' Commercial General Liability Coverage Form or the BNIC Policies' Commercial Liability Umbrella Form.

## COUNT III – NO DUTY TO DEFEND OR INDEMNIFY NDFCU
## (LATE NOTICE)

138.    StarNet and BNIC reallege and restate Paragraphs 1 through 137 as if fully set forth herein.

139.    The StarNet Policies and BNIC Policies required NDFCU, as a condition precedent to coverage, to notify StarNet and BNIC of a claim or "suit" as soon as practicable.

140.    The StarNet Policies and BNIC Policies required NDFCU, as a condition precedent to coverage, to provide written notice of a claim or "suit" as soon as practicable.

141.    The StarNet Policies and BNIC Policies required NDFCU, as a condition precedent to coverage, to immediately send StarNet and BNIC copies of any demands, notices, summonses or legal papers received in connection with a claim or "suit."

142.    NDFCU's obligation to provide notice to BNIC of claims, "suits," and copies of demands and legal papers existed regardless of the amount of the claim.

143.    Dilley filed the Counterclaim against NDFCU on October 19, 2021.

144.    Dilley filed the First Amended Counterclaim against NDFCU on September 19, 2022.

145.    Dilley filed the Second Amended Counterclaim against NDFCU on May 23, 2023.

146.    NDFCU did not provide notice to StarNet or BNIC of any pleading in the Underlying Matter until March 15, 2024.

147.    NDFCU's notice of the Underlying Matter to StarNet and BNIC was not as soon as practicable.

148.    NDFCU did not immediately provide StarNet or BNIC with copies of any demands, notices, summonses or legal papers received in connection with the Underlying Matter.

149.    NDFCU's failure to provide notice of the Underlying Matter to StarNet or BNIC as soon as practicable is a material breach of the StarNet Policies and the BNIC Policies.

150.    NDFCU's failure to immediately provide StarNet or BNIC with copies of any demands, notices, summonses or legal papers received in connection with the Underlying Matter is a material breach of the StarNet Policies and the BNIC Policies.

151.    StarNet and BNIC have been prejudiced as a result of NDFCU's failure to provide notice of the Underlying Matter.

152.    StarNet and BNIC have been prejudiced as a result of NDFCU's failure to immediately provide StarNet or BNIC with copies of any demands, notices, summonses or legal papers received in connection with the Underlying Matter.

153.    By reason of the foregoing, StarNet and BNIC have no duty to defend or indemnify NDFCU for the Underlying Matter and the Settlement.

**COUNT IV– NO DUTY TO DEFEND OR INDEMNIFY NDFCU**
**(NDFCU BREACHED THE COOPERATION AND VOLUNTARY PAYMENT CONDITIONS)**

154.    StarNet and BNIC reallege and restate Paragraphs 1 through 153 as if fully set forth herein.

155.    As a condition precedent to coverage under the StarNet Policies and BNIC Policies, NDFCU agreed to cooperate with StarNet and BNIC in the investigation or settlement of the claim or defense against the "suit."

156.    As a condition precedent to coverage under the StarNet Policies and BNIC Policies, NDFCU agreed not to voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without NDFCU's consent.

157.     At the time of the July 8, 2024, mediation, StarNet and BNIC's investigation into NDFCU's request for coverage for the Underlying Matter was ongoing, pending receipt and review of documents requested from NDFCU on April 26, 2024.

158.     At the time of the July 8, 2024, mediation, neither StarNet nor BNIC had denied coverage to NDFCU for the Underlying Matter.

159.     NDFCU failed to cooperate with StarNet and BNIC in their investigation and settlement of the Underlying Matter by failing to provide all information requested by them in order to evaluate NDFCU's tender and NDFCU's request that StarNet and BNIC participate in mediation.

160.     NDFCU failed to cooperate with StarNet and BNIC when it entered into the Settlement with Dilley and the Putative Class.

161.     NDFCU voluntarily made a payment and assumed an obligation without StarNet's or BNIC's consent when it entered into the Settlement with Dilley and the Putative Class.

162.     By entering into the Settlement, NDFCU materially breached the StarNet Policies and the BNIC Policies.

163.     By reason of the foregoing, StarNet and BNIC have no duty under the Policies to defend or indemnify NDFCU for the Underlying Matter and the Settlement.

**COUNT V– NO COVERAGE OWED TO DILLEY**
**(STAND IN THE SHOES)**

164.     StarNet and BNIC reallege and restate Paragraphs 1 through 163 as if fully set forth herein.

165.     For the reasons alleged in Counts I through IV above, StarNet and BNIC owe no coverage under the Policies to NDFCU for the Underlying Matter and the Settlement.

166.    To the extent that Dilley (either on his own account or as a representative of a purported class or any class to be certified in the future) seeks coverage from StarNet and BNIC as an assignee or by virtue of the entry of a consent judgment against NDFCU, Dilley "stands in the shoes" of NDFCU and has the same right to coverage, if any, that NDFCU has.

167.    Because StarNet and BNIC owe no coverage to NDFCU for the Underlying Matter and the Settlement, StarNet and BNIC owe no coverage to Dilley for the Underlying Matter and the Settlement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs StarNet Insurance Company and Berkley National Insurance Company pray that this Court enter a judgment in their favor against Defendants Notre Dame Federal Credit Union and David Dilley, awarding the following relief:

a.    A declaration that no coverage is available to NDFCU for the Underlying Matter and the Settlement under the StarNet Policies;

b.    A declaration that no coverage is available to NDFCU for the Underlying Matter and the Settlement under the BNIC Policies;

c.    A declaration that StarNet and BNIC owe no coverage to Dilley under the StarNet Policies and the BNIC Policies, either individually or as a representative of a purported class or any certified class, for the Underlying Matter and the Settlement.

d.    For such other and further relief at law or in equity that the Court deems just and proper.

## RESERVATION OF RIGHTS

The StarNet and BNIC Policies may contain terms, conditions, and exclusions that may be relevant to coverage for the Underlying Matter and the Settlement that are not currently addressed

in this declaratory judgment action. Nothing in this Complaint should be construed as a waiver by StarNet or BNIC of any coverage defenses at law, in equity, or under the Policies or any other policies issued by StarNet and BNIC to NDFCU.  StarNet and BNIC continue to reserve all rights with respect to any claim for coverage made under the Policies by NDFCU or Dilley, where appropriate, and waives none.

Dated:  July 23, 2024                                  Respectfully submitted,


*/s/ Amanda Bushemi Buckley*

David F. Cutter (Bar Admission to be Sought)
Emily R. Tripicchio (Bar Admission to be Sought)
Amanda Bushemi Buckley
BatesCarey LLP
191 N. Wacker Dr., Suite 2400
Chicago, IL 60606
T: (312) 762-3172
dcutter@batescarey.com
etripicchio@batescarey.com
abuckley@batescarey.com

*Attorneys for Plaintiffs StarNet Insurance Company
and Berkley National Insurance Company*